596 N.E.2d 236 (1992)
In the matter of the Termination of the Parent-Child Relationship of A.M. and E.M., the Children, and Laura McManus, Their Mother, and John Shaw, A.M.'s Father, and Jamie Stinson, E.M.'s Father.
No. 79A04-9110-CV-345.
Court of Appeals of Indiana, Fourth District.
July 20, 1992.
Transfer Denied September 15, 1992.
*237 Michael B. Troemel, Merritt, Troemel, Meyer & Hamilton, Thomas J. O'Brien, O'Brien & Morrissey, Lafayette, for appellants.
Edward J. Nemeth, Gambs, Mucker, Bauman & Seeger, Lafayette, for appellee.
CONOVER, Judge.
Respondent-Appellant Laura McManus appeals the trial court's judgment terminating her parental rights in her minor children, A.M. and E.M. Respondent-Appellant Jamie Stinson appeals the trial court's judgment terminating his parental rights in his minor child, E.M. The petition for termination was filed by the Tippecanoe County Department of Public Welfare (DPW). The appeals are filed jointly because the termination proceedings against both parents were held jointly.
We affirm as to Laura. We reverse as to Jamie.
Laura raises the following restated issues:
1. whether the trial court's judgment is supported by sufficient evidence; and
2. whether the trial court erred in not ruling on the admission of additional evidence.
Jamie raises the following issue:
1. whether the trial court's judgment is supported by sufficient evidence.

I. TERMINATION OF LAURA'S RIGHTS.
Laura gave birth to A.M. on July 31, 1986. A.M.'s father was determined to be John Shaw. Laura and Shaw were not married, but they did continue to maintain a stormy relationship. On April 30, 1987, A.M. was found to be a child in need of services after he was beaten by Shaw. The trial court allowed A.M. to remain in Laura's home if she would 1) provide for A.M.'s needs, 2) complete individual counseling sessions designed to help her deal with stress, 3) inform the DPW if Shaw *238 attempted to contact A.M., 4) obtain timely medical care for A.M., 5) provide accurate information to the DPW, 6) complete a psychological examination, and 7) complete a program with the Visiting Nurse.
While Shaw was in jail for the battery upon A.M., Laura gave birth to E.M. Laura initially claimed Jamie Stinson was E.M.'s father, but when Shaw got out of jail, she decided he was the father.
In July of 1987, DPW discovered Laura was again in a relationship with Shaw and was allowing him to have contact with A.M. In order to prevent any further physical abuse, the trial court placed A.M. in foster care. On or about January 19, 1988, A.M. was returned to the custody of his mother. In April of 1988, however, DPW visited Laura's trailer and discovered the heat was turned off, the children were sleeping in extremely dirty clothes, E.M. was sleeping in a bassinet which was too small, and the rooms were messy and cluttered. These conditions, coupled with the possibility of further abuse by Shaw, convinced the DPW to take action. Both children were removed from Laura's custody and placed in foster care.
On July 21, 1989, DPW filed a petition to terminate Laura's parental rights. After a hearing, the trial court granted the petition.
Laura contends the trial court's judgment is not supported by sufficient evidence. Specifically, she argues the evidence does not show she is unable to remedy the conditions resulting in the children's removal from her custody.
In order to effect the termination of the parent-child relationship, the DPW must present clear and convincing evidence to support the elements of IND. CODE 31-6-5-4. See, Matter of D.B. (1990), Ind. App., 561 N.E.2d 844, 847. IC 31-6-5-4 requires proof that:
(1) the child has been removed from the parent for at least six months under the dispositional decree;
(2) there is a reasonable probability that the conditions that resulted in the child's removal will not be remedied;
(3) termination is in the best interests of the child; and
(4) there is a satisfactory plan for the care and treatment of the child.
R.M. v. Tippecanoe County DPW (1991), Ind. App., 582 N.E.2d 417, 419.[1]
On appeal from a termination of parental rights, this Court will not reweigh the evidence, nor judge the credibility of the witnesses. Rather, we will consider only the evidence most favorable to the judgment and the reasonable inferences drawn therefrom. Griffin v. Bartholomew County Dept. of Public Welfare (1989), Ind. App., 542 N.E.2d 1385, 1388. Where the trial court has heard the evidence and has had the opportunity to judge the credibility of witnesses, we will not set aside the judgment unless it is clearly erroneous. Egly v. Blackford County Dept. of Public Welfare 592 N.E.2d 1232, 1234 (Ind. 1992). Termination of parental rights is proper where the children's emotional and physical development is threatened. Id.
In reviewing the trial court's determination, we keep in mind the right of parents to establish a home and bring up children is protected by the Fourteenth Amendment to the United States Constitution. Pierce v. Society of Sisters (1925), 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070. Parental rights are far more precious than property rights. May v. Anderson (1953), 345 U.S. 528, 533, 73 S.Ct. 840, 843, 97 L.Ed. 1221.
The evidence presented at the termination hearing shows that for four years DPW worked with Laura to teach her the skills necessary to allow her to raise her children. DPW also provided counseling to help her overcome characterological deficiencies. *239 Laura would make progress for short periods of time, but she would always regress. Her characterological problems were manifested by her inability to think about the consequences of future actions; this led to negative conduct resulting in repetition of the same mistakes over and over again. These problems were also manifested by her arrests for writing bad checks and shoplifting (three times in the six months preceding termination), and by her placing her needs above those of her children. Over the years Laura neglected A.M.'s medical needs, constantly moved from place to place (eight or nine residences over a two year period), allowed A.M. and E.M. to place small objects in their mouths during supervised visitation, allowed Shaw to be around the children, and failed to consistently visit the children when they were not in her custody. During one period of time, Laura moved out of town without giving notice to DPW; as a result of the move she did not visit A.M. and E.M. for eight months. All of Laura's counselors agree that due to her characterological disorders she will never change. Consequently, all counselors agree she will never be able to effectively mother A.M. and E.M.
The evidence strongly indicates Laura has habitually failed to provide for the needs of A.M. and E.M., and will continue the same pattern of conduct in the future. The trial court's judgment is not clearly erroneous. Therefore, the judgment is affirmed.
Laura also contends the trial court erred in not ruling on her motion to put on additional evidence after the termination hearing, but prior to the issuance of the judgment. She cites Page v. Greene County Dept. of Public Welfare (1991), Ind. App., 564 N.E.2d 956, in support of her contention. In Page, we stated:
Although a trial court should judge a parent's fitness to care for a child as of the time of the termination hearing and take into consideration any evidence of changed conditions, "the court must also evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation of the children."
564 N.E.2d at 960 (quoting Matter of J.K.C. (1984), Ind. App., 470 N.E.2d 88, 92).
Here, the evidence presented at the termination hearing established Laura was habitually unable to properly care for her children, and will never be able to maintain a stable enough environment to provide for their development. Historically, she has made progress for a short time with regress inevitably following. Under these circumstances, the trial court's failure to consider evidence of progress after the termination hearing is not reversible error.

II. TERMINATION OF JAMIE'S RIGHTS.
At the same time DPW petitioned to terminate Laura's rights with regard to E.M., it also petitioned to terminate Jamie's rights. It contended Jamie's rights should be terminated because he missed four visits with E.M. over the course of one year and he did not complete a parental evaluation. The trial court granted the petition.
Jamie contends the trial court's judgment is erroneous because there is no evidence to support termination of his parental rights. He contends DPW tacked his case onto Laura's to "tie up loose ends" so that an adoption could be effectuated.
E.M. was born on October 17, 1987. At the time of birth, her mother, Laura, was unmarried. She initially informed Jamie and his family that Jamie was E.M.'s father. However, when Laura's attentions turned to Shaw, she decided Shaw was E.M.'s father. Jamie lived with Laura for a short period immediately after E.M.'s birth, but was forced to move out. Jamie attempted to visit E.M., but Laura resisted. However, when she needed a baby-sitter for her children, she did allow Jamie and/or his parents and siblings to take care of E.M. Eventually, Jamie and his family observed behaviors and conditions which caused them to question Laura's ability to parent E.M. They informed DPW of their observations. Those observations provided a partial basis for the removal of E.M. from Laura's home.
*240 When DPW removed E.M., Jamie was informed he needed to establish paternity in order to have custody of E.M. After Jamie established paternity, DPW informed him he needed to 1) childproof his home, 2) complete a home study, 3) submit to a substance abuse evaluation, and 4) complete a parenting evaluation. The parenting evaluation was ordered although DPW did not have any reason, other than the fact he was under twenty years old, to doubt Jamie's ability to effectively parent E.M. In fact, DPW was aware that Jamie and his fiancee had a child which they were raising at the time. Although he completed the first three tasks, Jamie had trouble completing the parenting evaluation. Originally, he was scheduled to see a counselor provided by DPW at no cost. However, after missing the first two appointments because of work conflicts, he was required to find a counselor to conduct the evaluation at his cost. Although he did find a counselor, he did not finish the evaluation because of failure to pay. He testified at the termination hearing he was unable to pay for the evaluation.
The requirements for termination of parental rights under IC 31-6-5-4 are clear. As we noted above, the statute requires clear and convincing evidence that:
(1) the child has been removed from the parent for at least six months under the dispositional decree;
(2) there is a reasonable probability the conditions that resulted in the child's removal will not be remedied;
(3) termination is in the best interests of the child; and
(4) there is a satisfactory plan for the care and treatment of the child.
R.M., supra, 582 N.E.2d at 419.
DPW presented no evidence establishing the first three of these four elements. First, the evidence indicates E.M. was removed from Laura's care, not Jamie's. Jamie was not forced to relinquish care of E.M. under a dispositional decree; in fact, he was never allowed to exercise his parental rights with regard to his child due to DPW's assumption of his inability to properly parent. Of course, there was no evidence establishing "a reasonable probability that the conditions that resulted in the child's removal will not be remedied" since there was no removal from Jamie's care in the first place.
Finally, there was no evidence to establish termination of Jamie's parental rights was in E.M.'s best interest. DPW's denial of custody was not based on any evidence to indicate E.M., or any other child, had been, or would ever be, mistreated by Jamie. Indeed, even after one year in which DPW employees had constant contact with Jamie, the only evidence DPW offers against Jamie is its opinion Jamie lacks responsibility because (a) he did not complete a parental evaluation, (b) he missed four visits over the course of a year, and (c) he is young and poor.
DPW should not have tacked termination of Jamie's rights onto the petition to terminate Laura's rights under IC 31-6-5-4. There was a total lack of evidence to establish the required elements of the statute.[2] Therefore, as a matter of law, the trial court clearly erred in terminating Jamie's parental rights.[3]
AFFIRMED as to the termination of Laura's parental rights. REVERSED as to the termination of Jamie's parental rights.
CHEZEM and RUCKER, JJ., concur.
NOTES
[1] In R.M., we noted "IC 31-6-5-4(c) was amended effective July 1, 1990, and divided the undivided language of subsection (2) into an introductory paragraph and a subsection (2)(A); added `or' at the end of subsection (2)(A); added (2)(B) `The continuation of the parent-child relationship poses a threat to the well-being of the child'; and substituted `there is a' for `the county department has' in subsection (4)." 582 N.E.2d at 419, n. 1.
[2] We understand DPW's concern that E.M.'s transition from a foster home to care by a father she doesn't really know will be difficult for both E.M. and Jamie. However, provision of services to ease the transition, rather than termination of Jamie's rights, is the proper plan under the facts of this case.
[3] DPW, which according to the testimony of E.M.'s guardian ad litem was most concerned about quickly resolving the matter of E.M.'s custody, chose a plan of action which after nearly three years has not settled the matter. This is ironic, given testimony establishing that, even under DPW's critical view of Jamie, he would have been "ready" to parent E.M. from six months to one year after the date of the termination hearing.