**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Jul 03 2012, 9:30 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**JEFFREY E. STRATMAN**
Aurora, Indiana

ATTORNEYS FOR APPELLEE:

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

**AMANDA TEBBE CANESSA**
Indiana Department of Child Services
Lawrenceburg, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN THE MATTER OF THE INVOLUNTARY TERMINATION OF PARENT-CHILD RELATIONSHIP OF S.W., (minor child) and H.L., (mother), | ) ) ) ) | |
| Appellant, | ) ) | |
| vs. | ) ) | No. 15A01-1112-JT-623 |
| THE INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) ) | |
| Appellee. | ) ) | |

APPEAL FROM THE DEARBORN CIRCUIT COURT
The Honorable James D. Humphrey, Judge
Cause No. 15C01-1108-JT-25

**July 3, 2012**

**DARDEN, Judge**

<u>STATEMENT OF THE CASE</u>

H.L. ("Mother") appeals the involuntary termination of the parent-child relationship with her daughter, S.W.[1]

We affirm.

<u>ISSUE</u>

Whether there was clear and convincing evidence to support the termination of Mother's parental rights to S.W.

<u>FACTS</u>

S.W. was born in July 2009. In addition to S.W., Mother had four other children, all of whom were no longer in her care. In November 2009, when S.W. was four months old, the Dearborn County Department of Child Services ("DCS") received a report, alleging that Mother had limited mental functioning; that she was unable to properly care for S.W.; and that her parental rights to her other children had been terminated by the State of Ohio. Upon investigation by DCS, the family case manager found Mother's house to be "very cluttered with debris scattered across the floor[,]" including dirty diapers and "baby wipes soiled with human feces" littering the home and bedroom where Mother and S.W. slept, as well as, old food and a gallon jug of urine in Father's bedroom. (App. 55). The family case manager noted that the house "was not clean and smelled of body odor and garbage." (App. 55).

---

[1] R.W. ("Father") voluntarily terminated his parental rights as to S.W. and is not involved in this appeal.

2

DCS deemed the house unsafe, removed S.W. from Mother's home, and filed a petition alleging that she was a child in need of services ("CHINS"). Mother admitted that S.W. was a CHINS, and the trial court determined S.W. to be a CHINS.

In March 2010, clinical psychologist, Edward Conner, performed a psychological evaluation and parenting assessment of Mother. When Mother completed her Parenting Awareness Skills Survey and was asked to describe any areas of needed parental improvement, she answered "none." (DCS Ex. 1 at 8). In his evaluation report, Dr. Conner indicated that he had "grave concern" over Mother's response that she needed no parental improvement and opined that "[h]er conscious omittence of her areas of needed parental improvement and complete denial is very concerning and an indication of her lack of awareness and perhaps unwillingness to correct her parenting deficits." *Id.* at 8.

Dr. Conner's report also indicated that Mother, who inappropriately giggled and acted "giddy" during the evaluation, *id.* at 5, tended "to take on a rather 'Pollyanna' approach to criticism or conflict resolution, especially when she [was] confronted on her deficits." *Id.* at 10. Dr. Conner's report also revealed that Mother was in the "lower extreme" descriptive category on both verbal and nonverbal IQ tests, *id.* at 9, and he opined that she was "not mentally retarded" but that she may be "intellectually disabled." *Id.* at 10. In the report, Dr. Conner explained that Mother's low nonverbal IQ score "suggest[ed] that she may not always be able to properly identify complex variables in day-to-day parenting situations, place them in proper sequence and make accurate decisions." *Id.* at 11.

3

During the CHINS proceeding, Mother participated in services provided by DCS, including couple's therapy, supervised visitation, and home-based services. Her participation, however, did not result in significant change.

Two family aide specialists, Kathy Craig and Kelly Monohan, provided home-based services and worked with Mother on cleanliness and safety issues. Mother had multiple residences during the proceedings. With the assistance of family aide specialist Craig, Mother made "some progress" in cleaning. (Tr. 31). Nevertheless, each of Mother's residences had issues with cleanliness. At the time of the termination hearing, Mother's home had food on the floor and was infested with cockroaches.

The family aide specialists also supervised Mother's visits with S.W. and worked with Mother on parenting issues, including how to increase her bonding with S.W. Mother had supervised visits with S.W. two to three times per week. These visits occurred at varied locations, including at Mother's home, a community center, or in the park. During Mother's visits with S.W., Mother was not always attentive to S.W., and service providers frequently had to intervene and point out obvious safety concerns to Mother.

In August 2011, DCS filed a petition to terminate Mother's rights to then two-year-old S.W. The trial court held a termination hearing on October 31, 2011. During the hearing, multiple service providers acknowledged that Mother had participated in services and that she had made some progress. However, these providers also testified that any progress observed was not long term or significant enough to show that Mother could effectively care for S.W. Additionally, the service providers testified that Mother

4

was not bonded with S.W. and that Mother could not recognize potential safety issues concerning S.W.

For example, Kim Emyart, the therapist who conducted couples therapy with Mother and Father from November 2010 to July 2011, testified that Mother had actively participated in couple's therapy and acknowledged that Mother had "worked very hard" on her relationship and communication with Father. (Tr. 22). However, Emyart also indicated that she "had some concerns that [Mother] had some difficulty in family functioning[.]" (Tr. 19).

Emyart also conducted an initial assessment of Mother and testified that during that assessment—which was conducted just after Mother had lost custody of S.W. and was "struggling to make ends meet," (tr. 20)—Mother, who presented as "very happy [and] smiling[,]" (tr. 20), and "felt at the time that everything was great[,]" (tr. 21), did not recognize the need to make a change. (Tr. 21). Emyart explained that Mother had a "coping mechanism" in which she had a tendency to "disengage from her emotions when they bec[a]me too difficult for her to manage[.]" (Tr. 20). Emyart testified that Mother's coping mechanism leads her to be "incongruent in her affect" where she would present as smiling and happy on the outside while she is experiencing emotional pain on the inside. (Tr. 20). Emyart further explained that Mother's coping mechanism was a "double edge sword" because it helped her to avoid depressive symptoms but it also could "prevent her from making changes the way other people may make changes[.]" (Tr. 22). Emyart additionally testified that "this defense mechanism that [Mother] has . . . that she protects

5

herself with, is very, very strong, so it's hard for her to make those changes long lasting." (Tr. 22).

In regard to Mother's progress on remedying the cleanliness issues of her home that led to the removal of S.W., Kathy Craig, one of the family aide specialists, testified that Mother was willing to participate in services and acknowledged that Mother made "some progress" in cleaning her home after Craig had worked with her. (Tr. 31). Nevertheless, despite Mother's improvements, Craig explained that Mother "had problems maintaining the improvements[.]" (Tr. 28). Craig testified that "[u]sually cleanliness of the home . . . was an issue," (tr. 25), explaining that the home was usually "cluttered" and that many times Mother's home had "garbage overflowing" and empty food containers on the floor or coffee table. (Tr. 28). Additionally, Craig testified that the most recent home, where Mother was living at the time of the termination hearing, was "cluttered" with empty food containers and had "hard shell bugs." (Tr. 29).

Kelly Monohan, the other family aide specialist who worked with Mother, testified that there was "an ebb and flow" with Mother's ability to clean up her house but that the house was usually dirty and cluttered. (Tr. 48). Monohan testified that Mother would not keep the whole house clean but would sometimes clean one room and then try to keep S.W. confined to that room during a home visit. Monohan tried to explain to Mother that S.W. would be mobile and that she would need to keep the rest of the house clean as well. Monohan also testified that the home where Mother was living at the time of the termination hearing had the "wors[t] condition" she had seen of Mother's previous homes, (tr. 49), and that it "was much more dirty[.]" (Tr. 52). Monohan explained that

6

Mother's home had "a lot of food on the floor" and was infested with cockroaches. (Tr. 49).

Additionally, the family case manager, Denise Kirchgassner, testified that Mother had willingly participated in services. However, the family case manager testified that Mother had progressed "very little" and had not remedied the issues that resulted in S.W. being placed outside the home. (Tr. 68).

Finally, Mark Scott, the Guardian Ad Litem ("GAL"), testified that he had visited Mother's house approximately two weeks prior to the termination hearing and that the house was "cluttered" and still had food on the floor despite the exterminator's advice to keep the house clean to avoid roaches. (Tr. 63).

During the termination hearing, the service providers also testified regarding their concerns about Mother's inability to maintain a safe environment for S.W. and to properly supervise S.W. For example, Craig testified that Mother had pop cans and a lighter in the bedroom but explained that Mother—who stated that the cans were used as an ash tray and that the lighter did not work—failed to see how they posed a safety concern for S.W. Craig also testified that she did not believe that Mother had the ability to effectively recognize dangers and to protect S.W. from them.

Monohan also testified about safety concerns she had with Mother's parenting ability and explained that she had to repeatedly intervene during visits to redirect Mother about appropriate activities for S.W. For example, Monohan testified that Mother was not always attentive to S.W. during visits and that she had to frequently remind Mother of choking hazards with certain toys. Monohan also testified that she had to explain to

7

Mother, on more than one occasion, that she should not let S.W. crawl on a table. Monohan testified that while Mother had made "some progress" in her parenting skills, such as with meeting S.W.'s needs for food, Monohan had not really seen improvement in Mother's ability to recognize and deal with safety concerns. (Tr. 50).

The family case manager also testified that she had concerns regarding S.W.'s safety and Mother's ability to care for S.W. and to recognize potential dangers. Specifically, the family case manager testified that the condition of Mother's home was a safety concern because the bedroom was "cluttered with clothes, pop cans and medication[.]" (Tr. 67). The family case manager also testified that she had seen Mother fall asleep during supervised visits with S.W. Additionally, the family case manager also testified that termination was in S.W.'s best interest.

As far as Mother's bond with S.W., the GAL testified that Mother did not have an emotional bond with S.W. Additionally, both family aide specialists also testified regarding the lack of bonding between Mother and S.W. Craig acknowledged that Mother loved S.W. but testified that Mother had not shown improvement in her ability to interact with S.W. and did not appear to be bonded with S.W. Monohan also testified that Mother did not seem to be bonded with S.W. Monohan explained that when Mother had visits with S.W., she did not physically greet or touch her—i.e., no hugs or kisses—and did not help S.W. transition into or from the room during a visit. Monohan testified that she repeatedly worked with Mother on the importance of transitioning S.W. into the room for the visit, but Mother was unable to follow through and apply that advice to future visits with S.W.

Additionally, Dr. Conner, the psychologist who conducted a psychological evaluation and parenting assessment of Mother at the beginning of the CHINS proceeding in March 2010, testified regarding his clinical impressions obtained from that evaluation. When discussing his concern about Mother's parenting assessment survey response that she needed no parental improvement, Dr. Conner testified that it was "very unusual" for a person to respond in such a manner, especially when she was being evaluated for parenting issues. (Tr. 79). Dr. Conner's evaluation report, which revealed that Mother scored in the lower extreme on both verbal and nonverbal IQ tests and placed her reading and math ability at a grade school level, was also admitted as an exhibit.

Mother's counsel cross-examined the service providers about whether Mother's mental deficiencies contributed to Mother's inability to make the necessary level of improvement, and they agreed that her intellectual limitations could be a factor in her difficulty in making progress.

Finally, during the termination hearing, Mother testified that she cleaned her house "almost everyday" and that she had been keeping it clean. (Tr. 88). She acknowledged that her current home was infested with cockroaches but claimed that the entire apartment complex was too. Mother further testified that she recognized that she needed to make improvements in her parenting skills. Mother admitted that she had previously taken parenting classes in Ohio when her older children were removed from her by Ohio child services. Mother also acknowledged that she had four other children who were no longer in her care. According to Mother, who was twenty-six years old when S.W. was born, she gave up her first child, who was born when Mother was fifteen years old, for

adoption; she let her brother adopt two other children who had been removed from her by Ohio child services; and she let her ex-partner have custody of one child, who subsequently died in his father's care.

Following the termination hearing, the trial court issued an order terminating Mother's parental rights to S.W. Mother now appeals. Additional facts will be provided as necessary.

<u>DECISION</u>

Although parental rights are of a constitutional dimension, the law allows for termination of these rights when parties are unable or unwilling to meet their responsibility. *In re A.N.J.*, 690 N.E.2d 716, 720 (Ind. Ct. App. 1997). The purpose of termination of parental rights is not to punish parents but to protect children. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*, *cert. denied*.

In reviewing the termination of parental rights, we will neither reweigh the evidence nor judge the credibility of witnesses. *In re I.A.*, 934 N.E.2d 1127, 1132 (Ind. 2010). We consider only the evidence most favorable to the judgment. *Id.* Where the trial court has entered findings of fact and conclusions of law, we apply a two-tiered standard of review. *Id.* We must determine whether the evidence supports the findings and then whether the findings support the judgment. *Id.* We will set aside a judgment terminating a parent-child relationship only if it is clearly erroneous. *Id.* A judgment is clearly erroneous if the findings do not support the conclusions or the conclusions do not support the judgment. *Id.*

When DCS seeks to terminate parental rights, it must plead and prove, in relevant part:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child . . . .

Ind. Code § 31–35–2–4(b)(2).[2] These allegations must be established by clear and convincing evidence. *I.A.*, 934 N.E.2d at 1133. If the trial court finds the allegations in a petition described in section 4 of this chapter are true, the court shall terminate the parent-child relationship. I.C. § 31–35–2–8(a).

Because subsection (b)(2)(B) is written in the disjunctive, DCS need prove only one of the two elements by clear and convincing evidence. *See Bester v. Lake County Office of Family and Children*, 839 N.E.2d 143, 153 n.5 (Ind. 2005). Thus, if we hold that the evidence sufficiently shows that the conditions resulting in removal will not be remedied, we need not address whether the continuation of the parent-child relationship

---

[2] During the 2012 legislative session, Indiana Code section 31–35–2–4 was amended by Public Law No. 48–2012, §66 (effective July 1, 2012).

poses a threat to the well-being of S.W.[3]  *See* I.C. § 31-35-2-4(b)(2)(B); *A.N.J.*, 690 N.E.2d at 721 n.2.

1. Conditions Remedied

Mother argues that the DCS failed to prove that there was a reasonable probability that the conditions that resulted in S.W.'s removal or the reasons for placement outside the home will not be remedied.  Specifically, Mother contends that the DCS failed to meet its burden because there was evidence presented that Mother had engaged in services and had made improvements in remedying the cleanliness of her home.

To determine whether a reasonable probability exists that the conditions justifying a child's continued placement outside the home will not be remedied, the trial court must judge a parent's fitness to care for the child at the time of the termination hearing, taking into consideration any evidence of changed conditions.  *A.N.J.*, 690 N.E.2d at 721.  The trial court must also evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation.  *Id.*  A trial court may properly consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate employment and housing.  *McBride v. Monroe County Office of Family & Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003).  Additionally, the trial court can properly consider the services offered by DCS to the parent and the parent's response to those services as

---

[3] DCS contends that Mother has waived any argument challenging the trial court's threat to the well-being determination.  We do not need to determine whether Mother waived this issue nor review whether the evidence supports the trial court's conclusion that a reasonable probability exists that the continuation of the parent-child relationship poses a threat to S.W.'s well-being because we conclude that clear and convincing evidence supports the trial court's conclusion that a reasonable probability exists that the conditions that led to S.W.'s removal and reasons for placement outside the home will not be remedied.

12

evidence of whether conditions will be remedied. *Id.* "A pattern of unwillingness to deal with parenting problems and to cooperate with those providing social services, in conjunction with unchanged conditions, support a finding that there exists no reasonable probability that the conditions will change." *L.S.*, 717 N.E.2d at 210.

We acknowledge that Mother engaged in services and that various service providers testified that Mother had made some progress in trying to clean up her house; however, we cannot overlook the evidence that reveals that Mother had moved multiple times and that each of Mother's residences was cluttered with food and trash and had safety issues despite her attempts at cleaning.

Indeed, the GAL testified that the issues that resulted in S.W. remaining outside the home had not been remedied and further testified that he did not believe they would be remedied in the future. While he testified that Mother had made efforts to improve, he also testified that Mother had difficulty doing so. Specifically, the GAL testified that he had visited Mother's house approximately two weeks prior to the termination hearing and that the house was "cluttered" and still had food on the floor despite the exterminator's advice to keep the house clean to avoid roaches. (Tr. 63).

Additionally, both family aide specialists and the family case manager testified that Mother had not been able to maintain a consistent level of improvement in the cleanliness of her home and that the home where she lived at the time of termination hearing was the most troubling of Mother's homes. These service providers also testified regarding their concerns regarding Mother's inability to maintain a safe environment for S.W. and to properly supervise S.W.

Accordingly, we find that the trial court did not err in determining that there is a reasonable probability that the conditions that resulted in S.W.'s removal or the reasons for placement outside the home will not be remedied.

2. Best Interests

Mother also contends that DCS failed to prove that termination of her parental rights was in the best interests of S.W.

For the "best interests of the child" statutory element, the trial court is required to consider the totality of the evidence and determine whether the custody by the parent is wholly inadequate for the child's future physical, mental, and social growth. *In re A.K.*, 924 N.E.2d 212, 223 (Ind. Ct. App. 2010), *trans. dismissed*. In making this determination, the trial court must subordinate the interest of the parent to that of the child involved. *Id.* The recommendations of the service providers that parental rights be terminated support a finding that termination is in the child's best interests. *See A.J. v. Marion County Office of Family and Children*, 881 N.E.2d 706, 718 (Ind. Ct. App. 2008), *trans. denied*.

Here, the family case manager and the GAL testified that termination of Mother's parental rights was in S.W.'s best interest. Mother acknowledges that the family case manager's and the GAL's testimony regarding S.W.'s best interest but cites to *In re Termination of Parent-Child Relationship of A.B.*, 888 N.E.2d 231 (Ind. Ct. App. 2008), *trans. denied*, for the proposition that these service providers' testimony cannot be the sole basis for termination of parental rights. In that case, we held that a GAL's and caseworker's testimony that termination was in the child's best interest because it was in

14

the child's best interest to be adopted by a foster parent could not serve as the sole basis for terminating parental rights, especially where there was also no evidence to support the trial court's determination that conditions that warranted removal would not be remedied. *See A.B.*, 888 N.E.2d at 239 ("A parent's right to his or her children may not be terminated solely because a better place to live exists elsewhere.").

Here, however, there is evidence to support the trial court's conditions remedied determination. Furthermore, the totality of the evidence—not solely the testimony of the family case manager and GAL regarding best interests—demonstrated that the termination of Mother's parental rights was in S.W.'s best interests. Specifically, multiple service providers testified about their concerns regarding Mother's ability to maintain a safe environment for and to properly supervise S.W. Both family aide specialists who had supervised Mother's visits with S.W. testified that Mother had not exhibited the ability to effectively recognize and deal with dangers to S.W., and one of the aides testified that Mother had not really improved in her ability to deal with safety concerns. Additionally, the family case manager and the GAL testified regarding safety concerns for S.W. if she were to return to Mother's care. The GAL testified that he had "not seen enough improvement in the parenting skills of [Mother] to make [him] think that [S.W.] would not be in danger if she was returned home." (Tr. 60). Finally, multiple service providers testified that Mother did not have an emotional bond with S.W. In summary, the totality of the evidence reveals that there is evidence to support the trial

15

court's finding that termination of Mother's parental rights is in S.W.'s best interests. Accordingly, we affirm the trial court's termination of Mother's parental rights.[4]

CONCLUSION

We conclude there was clear and convincing evidence to support the trial court's decision to terminate Mother's parental rights to S.W. We reverse a termination of parental rights "only upon a showing of 'clear error' — that which leaves us with a definite and firm conviction that a mistake has been made." *Egly v. Blackford County Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1235 (Ind. 1992). We find no such error here and, therefore, affirm the trial court.

Affirmed.

NAJAM, J., and RILEY, J., concur.

---

[4] Mother also contends that the trial court erred by giving significant weight to Dr. Conner's testimony and evaluation because his evaluation occurred one and one-half years before the termination hearing, and she also suggests that the trial court may have terminated her parental rights based solely on her mental deficiencies. We disagree with both contentions. First, while the trial court stated in its order that it gave "considerable weight" to Dr. Conner's testimony and evaluation report, the trial court also acknowledged that it "view[ed] his testimony in light of significant time having passed since his evaluation ha[d] been completed." (App. 30). Additionally, turning to Mother's argument regarding mental deficiencies, we note that a parent's parental rights may not be terminated solely on the basis of his or her mental disability. *See R.M. v. Tippecanoe County Dep't of Pub. Welfare*, 582 N.E.2d 417, 420 (Ind. Ct. App. 1991). However, "[a] parent's abilities, including intellect, as they relate to the parent's capacity to provide for the needs of the child, are relevant factors to be weighed in a termination proceeding." *Id.* Here, however, the trial court's order makes clear that it did not terminate Mother's parental rights based solely on her mental deficiencies. In the order, the trial court acknowledged that "Mother's limited intellectual capacity has likely played a role in her inability to gain the necessary skills" but clarified that its decision to terminate Mother's parental rights was "not solely [based] on Mother's intellectual ability, but rather on the two years of services provided and the lack of substantial progress which would indicate reunification as a feasible goal." (App. 30).