**In the Matter of M.B. and C.B.,**
**Appellant–Respondent,**

v.

**DELAWARE COUNTY DEPARTMENT**
**OF PUBLIC WELFARE,**
**Appellee–Petitioner.**

No. 18A048911CV504.

Court of Appeals of Indiana,
Fourth District.

April 22, 1991.

Jack Quirk, Muncie, for appellant-respondent.

Michael M. Painter, Muncie, for appellee-petitioner.

MILLER, Judge.

Mother, age 22, appeals an order terminating her parental rights to her two children, M.B., age 5, and C.B., age 3. She argues that the Delaware County Department of Public Welfare (DPW) failed to offer her reasonable services before terminating her parental rights.

We affirm.

## FACTS

The facts most favorable to the decision of the trial court are as follows:

On April 16, 1987, Mother took C.B., then one month old, to Ball Memorial Hospital, in Muncie, Indiana, because the child was vomiting and had diarrhea. During C.B.'s stay in the hospital, the nurses reported that at times Mother was not feeding or changing C.B. and that even though Mother was present, the nurses did most of the feeding and changing of diapers. They also reported that Mother did not respond to C.B. when she cried. Mother was informed that the hospital staff was monitoring her behavior with regard to C.B. and that Child Protection Service (CPS) would be notified if she did not take better care of the child. Dr. Fujimura, C.B.'s treating physician, testified that C.B.'s illnesses—failure to thrive,[1] ear infection in both ears and dehydration—were due to parental neglect. He also stated that Mother would relay information to him about medical conditions that did not exist in C.B. He further testified that Mother seemed ambivalent when he would discuss parenting skills with her.

On April 20, 1987, Dr. Fujimura, Susan Scherrer, a social worker employed by Ball Hospital, and Bonnie Smith of the Child Protection Services met with Mother at the hospital, at which time Mother denied having any problems taking care of C.B.

When Dr. Fujimura recommended C.B. be placed in foster care, Mother tried to leave the hospital with C.B. The next day, Dr. Fujimura filed a child concern report with the CPS, stating that there were documented instances of neglect and that Mother fabricated the child's symptoms. He also suggested there was a danger Mother would leave with C.B. and recommended C.B. be taken from Mother's custody. This was the third time that Mother had been reported to the CPS.[2] On April 22, 1987, C.B. was placed in licensed foster care on the order of the Juvenile Court Referee.

On April 21, 1987, Bonnie Smith went to Mother's home to check the condition of the home and of M.B., C.B.'s older sister. The home was reportedly in poor condition with dirty clothes and trash on the floor, and with dishes, garbage and food scraps on the table. Smith made arrangements to have M.B. examined by Dr. Fujimura at this time. On April 27, 1987, M.B. was admitted to Ball Hospital with a diagnosis of failure to thrive. Dr. Fujimura did not find any medical reasons for M.B.'s failure to gain weight and to develop, but instead attributed the condition to social and nurturing problems. He recommended M.B. be removed from Mother's home and on May 1, 1987, the Juvenile Court Referee ordered M.B. to be placed in foster care.

On May 15, 1987, the DPW filed a petition indicating the children were in need of services, citing the following reason for both children:

> Said child is a child in need of services pursuant to IC 31–6–4–3(a) in that:
>
> his physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of his parent, guardian or custodian to supply the child with necessary

1. "Failure to thrive" was explained by Dr. Fujimura as "the child not growing as much as we would like a child to grow." (R. 553). It has also been described as "inadequate emotional or physical development of an infant, associated with neglect." F. Hill & D. Watson–Duvall, Children in Need of Services (Published by the Indiana Permanent Families for Children Task Force).

2. The record reveals that Mother had been reported to the CPS in 1985 for substantiated neglect and again in 1986 for unsubstantiated neglect. Homemaker services were initiated in 1985 by the Delaware County Welfare Department but were terminated a month later when Mother moved to Texas.

food, clothing, shelter, medical care, education or supervision.

(R. 32).

Mother consented to making the children wards of the DPW and to their placement in foster care on November 17, 1987. On December 30, 1987, the court declared C.B. and M.B. as children in need of services and ordered Mother to work with the DPW homemaker services and her counselor, Ron Hood, until released by him, and to attend parent nurturing classes.

Beginning in January of 1988, Mother was permitted extended visits with her children away from the welfare office. The children were often returned from these visits dirty, hungry, exhausted, and at times ill or with diarrhea. C.B. was often returned with saturated diapers. In March, the visits were extended to seven hours a week, even though the DPW was concerned about Mother's ability to feed the children. In April, visits were extended to twenty-four hours. On June 7, 1988, M.B. was returned from a visit with a human bite mark on her shoulder. She stated "Daddy Willie" (Mother's husband) had given it to her. Myra Rahe, Mother's DPW caseworker, testified that Mother told her after a visit that she fed the children nothing but snacks during their visit. She also testified that Mother said there was nothing wrong with her parenting skills.

Mother petitioned to have the children returned to her custody on June 20, 1988. The court denied her petition and granted DPW permission to file a petition to terminate her parental relationship to the children. The DPW filed this petition on July 7, 1988, and after a hearing, the court terminated Mother's parental rights to M.B. and C.B.[3] The court made the following relevant findings of fact:

3. *That [Mother] has been offered family counseling, homemaker services, parent/nurturing classes, parental support groups, psychological evaluations, and intervention by the caseworkers for the Delaware County Department of Public Welfare.*

4. That [Mother] has been hostile and resistive to Delaware County Department of Public Welfare's intervention and services.

5. *That [Mother] had quit counseling without the approval of her psychological counsellor, Ron Hood, or the Delaware County Department of Public Welfare.*

6. That [Mother] was rude, disruptive, and refused to participate in the parent/nurturing classes and parental support group on several occasions and had stated that the parental support group was "stupid" or a "waste of time."

7. That [Mother] has demonstrated anger and resistance with homemaker services, and has denied repeatedly that she is not providing adequate care and nurturing to her children.

8. That efforts have been made to place the children back with their Mother by extended visitation, but that when visitation was afforded, the children were often returned dirty, tired, ill, hungry and again, [Mother] insisted that she was a good parent and knew how to care for her children.

9. That [Mother] has been diagnosed by Dr. Kenneth Joy, a clinical psychologist, as having and suffering from a moderate to severe borderline personality disorder.

10. That the testimony of the case workers for the Delaware County Department of Public Welfare, Martin K. Fujimura, M.D., Rebecca Vertress, Homemaker of Open Door Community Service, Susan Scherrer, Pam Schraeder, and Sue Kirkpatrick supported such diagnosis, as they observed respondent's hostility, lack of cooperation, "know-it-all" attitude, and her unwillingness to recognize the needs of her children.

11. That [Mother], with the diagnosed borderline personality disorder, is not likely to benefit from counseling, is not likely to respond to treatment, be it counseling or psychiatric effort, that persons with such personality disorders are resistant to social services and are very

---

**3.** The fathers of both M.B. and C.B. were noti-    fied of the petition but failed to appear.

unlikely to recognize or deal with their problems, and the [Mother] is in that category.

12. That the reason for the children being removed from the custody of [Mother] initially was a failure-to-thrive syndrome diagnosed by Martin K. Fujimura, M.D., and that such malnutrition can be corrected by a parent or parents recognizing the existence of the problem and by education and counseling providing a social nurturing environment for the children but that [Mother] is either unable or unwilling to participate in services provided by the Department of Public Welfare and associated agencies, and that a reasonable probability exists that the condition that resulted in this removal will not be remedied.

13. That the Delaware County Department of Public Welfare has a satisfactory plan for the care and treatment of the children in that they continue in their present foster homes subject to placement eventually for adoption.

The court entered the following judgment:

1. That [M.B.], born March 1, 1985, and [C.B.], born March 5, 1987, are children in need of services as heretofore determined by this Court on December 30, 1987.

2. That the children have been removed from the parents for at least six months under the dispositional decree entered on December 30, 1987.

3. That there is a reasonable probability that the conditions that resulted in the removal of the children will not be remedied.

4. That reasonable services have been offered or provided to the parent, to assist her in fulfilling her parental obligation and she has either failed to accept them or such efforts have been ineffective.

5. That the termination of the parental rights of [Mother] is in the best interest of the children.

6. That the Delaware County Department of Public Welfare has a satisfactory plan for the care and treatment of the children.

## DECISION

The issue presented by Mother is whether the DPW offered reasonable services to her before the court terminated her parental rights. Ind.Code 31–6–5–4 requires the DPW to prove, by clear and convincing evidence, that the following four elements are met before a parent-child relationship may be terminated:

(1) the child has been removed from the parent for at least six (6) month under a dispositional decree;

(2) there is a reasonable probability that (A) the conditions that resulted in the child's removal will not be remedied; or (B) the continuation of the parent-child relationship poses a threat to the well-being of the child;

(3) termination is in the best interest of the child; and

(4) the county department has a satisfactory plan for the care and treatment of the child.

IC 31–6–5–4(c). This section was amended in 1982. Under the old provision,[4] the State was also required to allege and prove that it offered reasonable services to the parent and that the parent either refused the services or the services were ineffec-

---

**4.** Prior to the amendment, IC 31–6–5–4 provided as follows:

A petition to terminate the parent-child relationship involving ... a child in need of services may be signed and filed with the juvenile court only by the attorney for the county department or the prosecutor; that person shall represent the interests of the State in all subsequent proceedings on the petition. The petition must ... allege that:

1) the child has been removed from his parent for at least six (6) months under a dispositional decree;

2) there is a reasonable probability that the conditions that resulted in his removal will not be remedied;

3) *that reasonable services have been offered or provided to the parent to assist him in fulfilling his parental obligations, and either he has failed to accept them or they have been ineffective;*

4) termination is in the best interests of the child; and

5) the county department has a satisfactory plan for the care and treatment of the child.

tive. Although the statute as amended no longer requires this particular element to be proved, it could reasonably be expected that the trial court would consider the services provided by the DPW and the parents' response thereto in determining whether there is a reasonable probability that the conditions that resulted in the removal of the children will not be remedied—proof of which is now required under subsection IC 31–6–5–4(c)(2).[5] In fact, it is evident from the court's findings of fact that it did consider whether or not reasonable services had been offered. Thus, we will focus our discussion on whether the evidence was sufficient to support a finding that there is a reasonable probability that the condition that led to the children's removal from their home would not be remedied.[6]

■ In considering whether the evidence is sufficient to support a trial court judgment terminating parental rights, this court will not reweigh the evidence nor judge the credibility of the witnesses. *Matter of Fries* (1981), Ind.App., 416 N.E.2d 908; *Wardship of Bender* (1976), 170 Ind.App. 274, 352 N.E.2d 797. Only the evidence most favorable to the judgment will be considered. *Matter of Fries, supra.*

■ To determine whether there is a reasonable probability that the condition which resulted in the removal of the child from the parent's care will not be remedied, the trial court must evaluate the parent's patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation of the children. *J.K.C. v. Fountain County Department of Public Welfare* (1984), Ind.App., 470 N.E.2d 88.

■ The evidence here shows that Mother did not cooperate with the DPW and the various agencies assigned to help her, and that she did not improve the way she cared for her children. Failure to cooperate with those providing services coupled with failure to improve the unacceptable home conditions has been held to support a finding that there is a reasonable probability that the conditions that led to the children's removal will not be remedied. *In re D.B.* (1990), Ind.App., 561 N.E.2d 844. Thus, the evidence was sufficient to support the trial court's conclusion.

Dr. Fujimura testified that both C.B. and M.B. were small for their ages. He stated he could not attribute their condition to any physical problems, but that it was due to

5. We observe that this is in keeping with the stated policy of Indiana Juvenile Law found in IC 31–6–1–1:

It is the policy of this state and the purpose of this article:
(1) to provide a juvenile justice system that protects the public by enforcing the legal obligations children have to society;
(2) to provide a judicial procedure that insures fair hearings and recognizes and enforces the constitutional and other legal rights of children and their parents;
(3) to insure that children within the juvenile justice system are treated as persons in need of care, treatment, rehabilitation, or protection;
(4) to utilize diversionary programs which are consistent with public safety;
(5) *to strengthen family life by assisting parents to fulfill their parental obligations;* and
(6) to remove children from their families only when it is in the child's best interest or in the best interest of public safety.

6. We are aware that a "fundamental ·rule of statutory construction is that a statutory amendment changing a prior statute indicates a legisla-

tive intention that the meaning of the prior statute has been changed." *Economy Oil Corp. v. Indiana Dept. of State Revenue* (1974), 162 Ind.App. 658, 321 N.E.2d 215. The change in IC 31–6–5–4 might raise the inference that the legislature meant that no affirmative action need be taken by the DPW to attempt to rehabilitate the parent(s). For example, the legislature could have left the "reasonable services" provision out because there may be some instances where parents are so deteriorated that providing services would be fruitless.

On the other hand, we find it difficult to imagine a circumstance in which the DPW could prove that there is a reasonable probability that the condition that led to the children's removal from their home would not be remedied without first showing that services had been provided to try to remedy the situation.

Here, the change in the statute had no effect on the trial court's determination that the DPW had proved that there is a reasonable probability that the conditions would not be remedied because in its findings the court considered whether reasonable services had been offered. Thus, the effect of the change in the statute is not at issue here.

neglect by Mother. To remedy this, the DPW provided Mother homemaker services and parent/nurturing classes to teach her how to care for her children. Katherine Kirkpatrick visited Mother weekly from May to August, 1987. She discussed nutrition, menu planning, and the importance of establishing a permanent residence for the children. Kirkpatrick also provided Mother with some material to read and gave her exercises in menu planning to complete. Mother did not read the material or complete the exercises. Kirkpatrick testified Mother moved eleven times from May to August.

Rebecca Vertress began visiting Mother at her home in December, 1987. Vertress was often present when Mother was permitted to bring the children home for visits. She observed Mother give M.B., age 5, coffee. Vertress suggested this might not be healthy for M.B., but Mother continued to do so.

Mother was also ordered to attend parent/nurturing classes to help her develop parenting skills. Pamela Schraeder, who taught the classes, testified Mother expressed to her that she did not want to be at the class. Mother also told Schraeder that there was nothing wrong with the way she was raising her children. Mother attended twelve of the fifteen classes offered in the parent/nurturing course, but Schraeder testified she did not benefit from them. No tests were administered to determine the level of Mother's parenting skills; however, she was evaluated weekly by Schraeder on her interest, participation and attitude. Schraeder testified that on a scale from excellent to very poor, Mother consistently rated very poor in all three categories.

Mother was permitted to visit her children weekly, in supervised and unsupervised situations. When she was permitted to take the children from the welfare office on a visit, the children would often return with diarrhea, dirty, hungry, or exhausted. Each time Mother returned one of the children sick or hungry, Myra Rahe, her caseworker would suggest ways to prevent the diarrhea and the proper foods to feed the children. Mother did not follow these suggestions and the children continued to return hungry, dirty, ill or with saturated diapers.

Ron Hood was assigned as Mother's counsellor. He met with her fifteen or twenty times from September of 1987 to May, 1988, when Mother stopped seeing him. The counseling was aimed at helping Mother realize how her problems with her own childhood were affecting how she treated her children. Mother stopped seeing Ron Hood before he had released her from treatment.

Finally, Dr. Joy diagnosed Mother as having a moderate to severe borderline personality disorder. He testified that people with this disorder do not respond to treatment very well because they do not want to change. He stated that based on his evaluation of Mother, she was not a good parent and that she is not likely to improve in the future.

Mother was involved with the DPW over a period of *three years*. During that time, the DPW continued to provide services to her. The evidence shows that in some instances Mother did not cooperate with the DPW and in other instances did not benefit from those services. From this, the trial court could have concluded that there was a reasonable probability that the conditions that resulted in the children's removal would not be remedied.

In addressing Mother's specific argument that she was not provided reasonable services, we note that cases decided before IC 31–6–5–4 was amended hold that the test of what constitutes reasonable services is one that must be answered on a case by case basis. *See e.g., Matter of VMS* (1983), Ind.App., 446 N.E.2d 632; *Matter of Myers* (1981), Ind.App., 417 N.E.2d 926; *Matter of Fries* (1981), Ind.App., 416 N.E.2d 908. When a parent argues that reasonable services have not been provided, the bottom line question is whether the DPW did all that it could reasonably be expected to do under the circumstances. *Matter of VMS, supra.*

Mother argues that she should have been provided counselling aimed specifically at

curing her personality disorder. In her brief, she concedes that Dr. Joy testified that persons with a disorder such as Mother's do not respond to treatment. Despite this, the DPW did provide counseling for Mother as well as parent/nurturing classes and homemaker services.

The evidence here shows that the children were failing to thrive because of improper nutrition and because of their social environment. The DPW provided services to try to remedy this problem—they appointed a counselor and provided parent-nurturing classes as well as homemaker services to teach Mother how to provide proper nutrition for the children and to show her how to provide an environment in which the children could thrive. Thus, the evidence shows that the DPW did all that could reasonably be expected under the circumstances.

There was clear and convincing evidence to sustain the trial court's decision. The decision is therefore affirmed.

CHEZEM and GARRARD, JJ., concur.