In the Matter of the Termination of
the Parent–Child Relationship
of R.M., minor child,

and

Teresa L. Morris, Appellant–
Natural Mother,

v.

TIPPECANOE COUNTY DEPARTMENT
OF PUBLIC WELFARE, Appellee–
Petitioner.

No. 79A02–9010–CV–629.

Court of Appeals of Indiana,
Second District.

Dec. 9, 1991.

John M. Sorensen, Lafayette, for appellant-natural mother.

Edward J. Nemeth, Gambs, Mucker, Bauman & Seeger, Lafayette, for appellee-petitioner.

SHIELDS, Judge.

Teresa L. Morris appeals the involuntary termination of her parental rights with respect to her second child R.M.

We affirm.

## ISSUE

Whether sufficient evidence exists from which the trier of fact could determine, by clear and convincing evidence, a reasonable probability that the conditions justifying termination of the natural parent-child relationship will not be remedied.

## FACTS

Appellant Teresa L. Morris (Morris) is the mother of three children: G.M., the oldest, who was found to be a child in need of services (CHINS) and placed in the temporary custody of the Tippecanoe County Department of Welfare (Department) immediately following his birth; R.M., the middle child, also a CHINS placed in the temporary custody of the Department and the subject of this action; and C.M., who died of Sudden Infant Death Syndrome approximately four months after birth. All three children were born out-of-wedlock and paternity has not been established.

R.M. has not been in Morris' home except for her monitored visits with Morris which began when she was approximately three years old. The trial court terminated the parent-child relationship between Morris and R.M. on July 2, 1990.

Morris' mental and emotional instability, originally diagnosed as "atypical psychosis and adjustment disorder with depressed mood," Record at 187, contributed to her inability to adequately attend to the needs of R.M. She was hospitalized in a Virginia mental health facility in 1985 (which she testified was a result of drug use, specifically alcohol and "acid"). Following the birth of G.M., Morris' mental disorders caused her to be hospitalized at the Wabash Valley Mental Health Hospital (Wabash) and the Logansport State Hospital. After R.M.'s birth, Morris returned to Wabash in late 1987 and early 1988. Her most recent hospitalization occurred in May of 1989 after C.M.'s death. She was subsequently rediagnosed as a schizophrenic, disorganized type. Tests also indicated Morris has an I.Q. of 75 which is considered borderline retardation.

The Department offered several services during the course of these proceedings to assist Morris in her efforts to stabilize her mental and emotional state and meet her children's needs. These services included intensive counseling, Day Treatment (partial hospitalization), supervised visits with her children, and a program designed to teach independent living skills. Morris' participation tended to mirror the episodic nature of her mental disorder. She would refuse to attend some of the mandatory sessions either because of disinterest or her belief that her parenting skills were adequate enough to excuse her absence, despite objections by her caseworkers to the contrary. Morris also resisted and later voluntarily discontinued the anti-psychotic medicine prescribed to counteract some of the negative symptoms associated with schizophrenia and generally control her psychosis.

A caseworker who accompanied and monitored R.M.'s visits with Morris testified to R.M.'s disturbing reactions when she was with Morris. R.M. had crying and screaming fits on the way to Morris' house, became withdrawn and unresponsive during the visit, and was upset when the case-

worker left her alone with Morris. The caseworker also observed Morris' lack of appropriate concern for R.M.'s safety, her inability to interpret R.M.'s wants and desires, and her apparent disregard for R.M.'s nutritional needs.

Due to R.M.'s adverse reactions toward Morris, the Department hired a clinical psychologist to evaluate the parent-child bonding between R.M. and her mother. The psychologist found R.M. to be bright and cheerful with an excellent attention span and engaged in advanced goal-directed behavior for a child her age. However, when R.M. came in contact with Morris, she was detached, listless, and virtually inactive. Because R.M.'s behavior was specific to her contact with Morris, it was the psychologist's professional opinion that continued contact would be severely damaging unless and until Morris was better able to recognize and respond to her child's needs.

The trial court found Morris incapable of understanding and appreciating the needs of R.M., unable to control her psychosis during times of stress, and unwilling to unconditionally participate in the programs established for her by the Department to deal with her situation. Accordingly, the trial court granted the Department's petition to terminate her parental rights and keep R.M. in the Department's custody pending adoption.

Morris appeals, arguing her association with C.M. prior to C.M.'s death was evidence of her progress and the reasonable probability that with proper guidance, she could remedy the conditions that resulted in R.M.'s removal from the home.

## DISCUSSION

■ The Department must prove, by clear and convincing evidence, that the following elements have been met to justify the termination of a parent-child relationship:

(1) The child has been removed from the parent for at least six (6) months under a dispositional decree;

(2) There is a reasonable probability that the conditions that resulted in the child's removal will not be remedied;

(3) Termination is in the best interests of the child; and

(4) The county department has a satisfactory plan for the care and treatment of the child.

IC 31–6–5–4(c) (1988)[1]; *J.K.C. v. Fountain County Department of Public Welfare* (1984), Ind.App., 470 N.E.2d 88, 91. On review of the trial court's determination, this court will neither reweigh that evidence nor reassess the credibility of the witnesses. *M.B. v. Delaware County Department of Public Welfare* (1991), Ind. App., 570 N.E.2d 78, 82. Rather, we will consider only the evidence most favorable to the judgment. *Id.*

■ To determine whether a reasonable probability exists that the conditions justifying the child's removal from the home will not be remedied, the trial court should determine the parent's ability to meet the needs of the child as of the time of the termination hearing, taking into account any evidence of changed conditions. *J.K.C.*, 470 N.E.2d at 92. Due to the permanency of termination, the trial court must also consider the parent's habitual patterns of conduct as a means of determining the probability of future detrimental behavior. *Id.*

In *M.B. v. Delaware County Department of Public Welfare* (1991), Ind.App., 570 N.E.2d 78, a mother, also faced with termination of her parental rights, lost her battle with the State when this court affirmed the trial court's judgment. This court held the evidence she had resisted the Department's intervention and services, denied the need for her to attend parent/nurturing classes and a parental support group, and failed to cooperate with or benefit from the services offered to her to the

---

**1.** IC 31–6–5–4(c) was amended effective July 1, 1990, and divided the undivided language of subsection (2) into an introductory paragraph and a subsection (2)(A); added "or" at the end of subsection (2)(A); added (2)(B) The continua-

tion of the parent-child relationship poses a threat to the well-being of the child; and substituted "there is a" for "the county department has" in subsection (4).

extent necessary to overcome her inadequate parenting skills, in conjunction with the evidence a clinical psychologist diagnosed the parent as having a moderate to severe borderline personality disorder which could interfere with treatment because people similarly afflicted are unwilling to change, met the clear and convincing evidence standard. In so doing, this court observed that "[f]ailure to cooperate with those providing services coupled with failure to improve the unacceptable home conditions has been held to support a finding that there is a reasonable probability that the conditions that led to the children's removal will not be remedied." *M.B.*, 570 N.E.2d at 82. *See also In re D.B.* (1990), Ind.App., 561 N.E.2d 844, 848.

■ Morris argues her success with C.M. is proof of her ability to take care of R.M., although she concedes she still requires "proper services" to remedy her mental and emotional problems. Appellant's Brief at 10. Morris' attendance and participation in the Department's programs did improve when her psychosis was in remission, but she also became less involved when she was unable to control her disability. Furthermore, she refused to take medication prescribed for her psychosis on a regular, on-going basis. She expressed her displeasure at having to endure parenting programs which she deemed unnecessary because she believed she already had adequate parenting skills. She failed to convince her caseworkers and a clinical psychologist of her physical, mental, and emotional capability to care for the needs of R.M. Finally, R.M.'s unnatural and erratic behavior toward her mother raises questions as to the possibility for normal mother-child bonding. Considering this clear and convincing evidence, the trial court was justified in determining no reasonable probability existed that Morris would be able to provide the necessary care for R.M.

■ Morris' claim of error also centers upon issues of mental illness and limited intellect. She cites the dissent in *In re Wardship of B.C.* (1982), Ind., 441 N.E.2d 208, in which Justice Hunter asserted medical evidence "is the only vehicle by which to truly determine whether there is a 'reasonable probability that the conditions which resulted [in child's removal] will not be remedied,' as is required by Ind.Code § 31-6-5-4(2)." *Id.* at 213. However, the majority opinion in *B.C.* refused to reverse the trial court's decision to terminate the mother's parental rights "on the mere claim that some medical program might exist which might possibly cure [the mother]," *id.* at 211, stating a reasonable effort had been made to help her through adequate medical procedures and parenting services. Here we conclude, as did the majority in *B.C.*, that existence of factors such as Morris' instability when not hospitalized, her failure to take medication, her failure to maintain a stable home life, and her failure to cooperate with counseling and parenting programs constitutes ample evidence Morris' present mental condition will not be remedied.[2]

■ Morris also argues mental retardation of a parent is not grounds by itself to terminate a parent-child relationship. We do not disagree. However, mental retardation is a factor to be considered along with other pertinent evidence bearing upon the question of a parent's fitness. *See Egly v. Blackford County Department of Public Welfare* (1991), Ind.App., 575 N.E.2d 312, 314; *In re Dull* (1988), Ind. App., 521 N.E.2d 972, 976. A parent's abilities, including intellect, as they relate to the parent's capacity to provide for the needs of the child, are relevant factors to be weighed in a termination proceeding. *In re M.J.G.* (1989), Ind.App., 542 N.E.2d 1385, 1389; *Dull.*

This court is fully aware of the State's strong and consistent commitment to family unity and integrity. We are also aware that the involuntary termination of a parent-child relationship is the most severe action that may be taken, *In re D.B.*, 561

---

**2.** Morris does not dispute the quality of the medical and social programs offered her and thus they are not in issue.

N.E.2d at 847, and we would not condone the breakup of a natural family for the sole reason it would be in the child's "best interests." *In re G. Joseph* (1981), Ind. App., 416 N.E.2d 857, 859.

However, the State's compelling interest for the general welfare of a child obligates it to intervene once parental deprivation is established. *Id.* Children are removed "because the present place in the custody of their parents is wholly inadequate for their very survival." *In re Miedl* (1981), Ind., 425 N.E.2d 137, 141. The potential danger to R.M.'s physical and emotional well-being causes serious concern for a continuing healthy development if she is returned to a mother who is unable to provide the stability and uninterrupted support needed for a child of her age. By employing a "best interests" standard, following proof of parental deprivation, as a means of preserving—or in this case, creating—an environment conducive to meeting the "need of every child for unbroken continuity of affectionate and stimulating relationships with an adult," *In re G. Joseph*, 416 N.E.2d at 861 (citation omitted), we affirm the trial court's determination that the conditions resulting in removal could not reasonably be expected to improve. With R.M.'s welfare as the paramount concern, there was sufficient evidence for the trial court to find that the best interest of this child was termination of the parent-child relationship and placement in an alternative home.

Judgment affirmed.

SULLIVAN and RUCKER, JJ., concur.