## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**
Apr 09 2015, 9:16 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT A.B.

Michael B. Troemel
Lafayette, Indiana

ATTORNEY FOR APPELLANT B.R.

Harold E. Amstutz
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

James D. Boyer
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Termination of the Parent-Child Relationship of:<br><br>A.R. & T.R. (Minor Children)<br>And<br>B.R. (Father), & A.B. (Mother),<br>*Appellant-Respondent,*<br><br>        v.<br><br>The Indiana Department of Child Services, | April 9, 2015<br><br>Court of Appeals Case No.<br>79A04-1409-JT-414<br><br>Appeal from the Tippecanoe Superior Court<br><br>The Honorable Faith A. Graham, Judge<br><br>Case Nos. 79D03-1403-JT-11 and 79D03-1403-JT-12 |

*Appellee-Petitioner*

**Vaidik, Chief Judge.**

# Case Summary

Mother and Father appeal the termination of their parental rights to their minor children. On appeal, both Mother and Father raise several issues, which we restate as whether the trial court was acting within its discretion when it denied Father's motion to continue based on his incarceration, and whether the trial court's termination of both parents' parental rights was supported by clear and convincing evidence. We affirm.

# Facts and Procedural History

A.R., born in 2005, and T.R., born in 2007, are the minor children of A.B. ("Mother") and B.R. ("Father"). In March 2013 the Indiana Department of Child Services ("DCS") received a report that Mother was using drugs with a boyfriend and not caring for the children. Investigation revealed that Mother had left the children with a non-relative[1] approximately three weeks earlier. Before they were left with the non-relative, the children had been living with

---

[1] The children were sleeping on the floor at the house of the non-relative, who said she did not have the financial means to care for the children. This person also has prior DCS history, and her parental rights to her children were terminated in 2008. Ex. 1, p. 52.

Mother for two weeks and with a paternal aunt for an approximately four-month-long period before that.

[3] DCS removed the children from the non-relative's house. The children were taken to the emergency room, where they were both treated for strep and lice; one child also had an ear infection and required extensive dental work. At the time the children were removed, DCS was unable to locate Mother; Mother later testified that she was prohibited from using the telephone by her then-boyfriend, by whom she was abducted and taken out of state shortly thereafter.

[4] When DCS family case managers went to the county jail to speak with Father, who was incarcerated when the children were removed, he revealed that he had not been in contact with Mother since Thanksgiving 2012 and believed that the children were still residing with his sister, their paternal aunt. Father was incarcerated throughout the entire underlying Child in Need of Services ("CHINS") and termination proceedings; indeed, he has been incarcerated for most of the children's lives—"probably 75, 80 percent of the time," according to Mother. Tr. p. 23.

[5] On March 28, 2013, after being removed from the non-relative's home, the children were placed in protective custody under a CHINS Detention Hearing Order. A CASA was appointed to represent the best interests of the children.

[6] On April 22 an evidentiary fact-finding hearing was held. Mother failed to appear at the hearing and was defaulted; Father waived his rights pursuant to statute and admitted to the allegations contained in the CHINS petition.

Following the hearing, the children were adjudicated CHINS, services were ordered, and the children remained in foster care due to the unavailability of both parents. The CHINS order detailed the reasons for the children's removal and CHINS status, including:

- Father was incarcerated when the children were removed and thought they were being cared for by their paternal aunt

- Father's significant criminal history primarily stemming from substance abuse, and his prior DCS involvement

- DCS's inability to locate Mother, and Mother's failure to appear at hearings

- Mother's showing over the preceding months that she was unable to provide for the safety, well-being, and stability of the children

- Mother's history with DCS, including substantiations for neglect in 2000, 2002, 2003, 2004, and 2005; Mother's parental rights to three other children were terminated; and she has two other children in care of their father

Ex. 1, p. 52. Additional CHINS hearings were held throughout 2013. Mother was incarcerated from August to December 2013 after she turned herself in on outstanding warrants. Three days after her release on December 2, Mother tested positive for methamphetamine. In this, her third CHINS case,[2] Mother

[2] Mother has been involved in two prior CHINS proceedings. Mother's first CHINS case involved two different, older children (J.R. and K.R.), and came about because of Mother's drug use, criminal activity, incarceration, failure to care for the children for days at a time, and the children's exposure to domestic violence and sexual abuse; that CHINS proceeding resulted in involuntary termination of Mother's parental rights to those children. Mother's second CHINS case involved yet another older child, A.B., and came about because of Mother's criminal activity and incarceration; Mother's second CHINS case also resulted in involuntary termination of her parental rights to A.B. *See* Father's App. p. 22 (order terminating parental rights). Neglect was substantiated against Father with regard to a different child in November 2004 as a result of his involvement in robbing a Village Pantry, and against both parents in 2005 when A.R. was born drug exposed.

stopped attending services around the end of January, beginning of February 2014.

[7] In March 2014 a permanency planning hearing was held; Mother failed to appear and was ordered defaulted. Following this hearing, the trial court changed the children's permanency plan from reunification to termination of parental rights. DCS filed its termination petitions.

[8] On May 22, 2014, Father filed a motion to continue the scheduled May 30 termination fact-finding hearing ("TFH") on the ground that Father was incarcerated. The trial court denied the motion. On May 30, immediately before the TFH, Father asked the court to reconsider his request for continuance, which Mother supported. As Mother's counsel stated, "Mom and Dad are very content to see what happens with their criminal dispositions before we go to this important of a hearing." Tr. p. 7. The trial court denied Father's motion, stating as follows:

> [A] petition to terminate parental rights when filed requires the Petitioner to request a hearing and the statute provides that the Court shall commence the hearing within 90 days. I'll note that this petition was filed on March 17th, 2014 and that today is May 30th, 2014 and there's no way Father will be released prior to the expiration of 90 days from the date that the petition was filed. So I will certainly commence the trial today, but perhaps entertain a renewed motion at the conclusion of these proceedings within [] 180 days.
>
> * * * * *

> And just for further clarification, even absent that statute I don't believe a continuance at this point is warranted. So we're going to commence the trial going forward.

*Id*. at 10-11 (formatting altered).

[9] At the time of the termination hearing, Mother, then thirty-two years old, was incarcerated, having been arrested in April 2014 and facing charges for dealing in and possession of methamphetamine, illegal drug lab, possession of marijuana, and two charges of operating a vehicle while suspended. Father, who was thirty-four years old at the time of the TFH, also has a history of instability and an extensive criminal history, mostly stemming from substance abuse. Specifically, Father has had fifteen separate convictions for mostly drug- and alcohol-related crimes—plus theft, intimidation, and escape—over a fourteen-year period. Numerous petitions to revoke Father's probation have been filed for non-compliance with various probationary sentences; the majority of probation violations involved substance-abuse relapses.

[10] While incarcerated, Father regularly sent letters to the children and, under a court order, participated in two or three telephone calls with the children. But at the TFH, family case manager Ashley Weinkauff ("FCM Weinkauff") testified that the children "don't want to talk to [Father] on the phone." *Id*. at 89. FCM Weinkauff went on to say: "They're scared; they address him like a stranger and said they've never really known him." *Id*. at 90.

[11] At the hearing, Father acknowledged his substance-abuse problem. Father testified: "When I went to prison in 2007 is when I realized I needed to change

my life and the way I was doing things." *Id*. at 59. That "realization," however, was followed by additional drug convictions in 2012 (Class D felony possession of legend drug) and 2013 (Class D felony possession of marijuana with prior and Class D felony possession of controlled substance). Father also testified as follows:

> I'm [b]ipolar and I'm supposed to take medication for that. I try to refrain from that because I have an addictive personality and I don't like to take the medication. I try to substitute with marijuana, that doesn't help, it's illegal and it's just made matters worse for me.

*Id*. at 61.

[12] Father has taken steps to deal with his substance abuse. Specifically, he has taken classes, such as "Thinking for a Change" and "Celebrate Recovery," which he took three times while incarcerated. He sought a mentor through NA and AA and counseling through a church. He has also read self-help books and the Bible. Moreover, he testified that he is very eager to receive more services if the court would order them.

[13] FCM Weinkauff stated that in her opinion, there is not a reasonable probability that the problems that led to removal will be remedied. This opinion, she testified, was based on "[t]he criminal history involving drug and substance use as well as alcohol use and previous CHINS cases . . . [c]ontinued re-entry into the system; continued incarceration over a long duration of time." *Id*. at 80. As to Father, FCM Weinkauff testified: "The particular thing I see is he's had chances to better himself, chances to get into treatment for drug and alcohol and all of his charges are generally involving that." *Id*. at 82. At the hearing,

Father testified at length as to his love for his children, and FCM Weinkauff agreed that she has "no doubt that he loves his children[,]" but that is not the issue: "we feel that history will repeat itself and it's not a concern with his love for the children." *Id*. at 83. As to Mother, FCM Weinkauff stated that the problem was "[t]he same thing; repeated cycle of incarceration due to drug use, as well as repeated cycle involving CHINS cases." *Id*. at 84 . Regarding whether "continuation of the parent-child relationship would represent a threat to the well-being of the children," FCM Weinkauff testified that she thought it would. FCM Weinkauff continued:

> I feel it's inadvertently a threat due to the consistent drug use, the kids' instability of being placed from family to family member to family friend and the continued incarceration from time to time. They have had spurts where they haven't gotten in trouble, but then that's detrimental to the [children's] mental health when a parent leaves for incarceration and is placed with someone else.

*Id*. at 86.

[14] Finally, FCM Weinkauff testified as to how the children were thriving in their current foster placement, where they had been living for fifteen months:

> The [children's] behaviors have improved, they have stability and structure. A[.R.] has struggled in school and she's been evaluated for an IEP and she's been improving due to work with foster home and the school in order to adjust her schedule for homework. Just general overall well-being for the [children] has increased. . . . They have less outbursts; they listen to redirection . . . at school, not just in foster home; they interact with peers well, and they get in less fights and arguments.

*Id*. at 86-87. As to why it is not in the children's best interests to give the parents more time, FCM Weinkauff testified: "The children need stability and

permanency; . . . to know where their home is, . . . to know that they're not going to be placed somewhere else in the near future, they need somewhere that they'll stay at the rest of their life." *Id.* at 88.

[15] The CASA, Susan Goecker ("CASA Goecker"), also testified at the hearing. CASA Goecker testified that she was present during a telephone call between Father and the children, and T[.R.] "clung to the foster mom the whole time; she was really afraid she said." *Id.* at 115. When asked about the bond between Father and the children, CASA Goecker testified, "They don't remember him." *Id.* at 116. CASA Goecker further testified that "[the children are] very secure where they are now" and that they "call the [foster] parents mom and dad." *Id.* at 118. Finally, CASA Goecker testified that her recommendation in this case is termination with adoption, primarily due to the parents' "drug uses and dependencies and unlawful doings." *Id.* at 119.

[16] In August, the trial court issued an order terminating Mother's and Father's parental rights. In addition to an extensive list of factual findings, the trial court's order included the following conclusions of law:

> 1. There is a reasonable probability that the conditions that resulted in the removal of the children from the parents' care or the reasons for the continued placement outside the home will not be remedied. Neither parent has demonstrated the ability or willingness to make lasting changes from past behaviors. There is no reasonable probability that either parent will be able to maintain stability to care and provide adequately for the children.
>
> 2. Continuation of the parent-child relationship poses a threat to the well-being of the children. The children need stability in life. The children need parents with whom the children can form a permanent

and lasting bond to provide for the children's emotional and psychological as well as physical well-being. The children's well-being would be threatened by keeping the child in parent-child relationships with either parent whose own choices and actions have made them unable to meet the needs of the children.

3. DCS has a satisfactory plan of adoption for the care and treatment of the children following termination of parental rights. The children can be adopted and there is reason to believe an appropriate permanent home has or can be found for the children as a sibling group.

4. For the foregoing reasons, it is in the best interests of A[.R.] and T.[R.] that the parental rights of [] Mother, and [] Father [] be terminated. Further efforts to reunify would have continued negative effects on the children.

Father's App. p. 26.

[17] Father and Mother now appeal.

# Discussion and Decision

## I. Denial of Motion for Continuance

[18] On appeal, Father contends first that the trial court abused its discretion in denying his written motion to continue the TFH. Father appeared in person at the termination hearing, where he testified and presented evidence. What he was really seeking with his motion for continuance, as he concedes in his brief, was an opportunity to "complete his incarceration, engage in services, and demonstrate that there had been a change in his conditions." Father's Br. p. 7.

[19] The decision to grant or deny a motion for a continuance rests within the sound discretion of the trial court. *Rowlett v. Vanderburgh Cnty. Office of Family &*

*Children*, 841 N.E.2d 615, 619 (Ind. Ct. App. 2006), *trans. denied*. We will reverse the trial court only for an abuse of that discretion. *Id*. An abuse of discretion may be found in the denial of a motion for a continuance when the moving party has shown good cause for granting the motion. *Id*. However, no abuse of discretion will be found when the moving party has not demonstrated that he or she was prejudiced by the denial. *Id*.

[20] In his motion to continue, Father stated, in part, as follows:

> 1. [Father] is currently incarcerated with an expected release date of October 2014 or sooner.
>
> 2. [] [F]ather has been incarcerated for the duration of this matter.
>
> 3. [] [F]ather has participated as allowed by the DCS/Court – by sending weekly letters and cards to the children. In[-]person visits at the DOC have not occurred, but through no fault of [] [F]ather.
>
> 4. [] [F]ather has participated in programs while in DOC to better himself and better prepare him upon his release.
>
> 5. [] [F]ather's incarceration has prevented him from being able to actively and appropriately participate in most services, most importantly, regular visitations with his children. [] [F]ather is willing to participate in any services after his release that are recommended by the DCS and/or ordered by the Court.

Father's App. p. 18.

[21] Father asserts that in cases of an incarcerated parent, when the children can continue their current placement and there is "little harm" to the children by extending the CHINS and giving the parent additional time, that is a "factor the court should consider." Father's Br. p. 8. Father cites numerous cases in support of this proposition. However, only the *Rowlett* case involves an

incarcerated parent requesting a continuance. *See* 841 N.E.2d 615. In that case, this Court wrote as follows:

> [W]e conclude that Father showed good cause for granting his motion to continue the dispositional hearing—an opportunity for him to participate in services offered by the OFC directed at reunifying him with his children upon his release from prison. We acknowledge that Father requested a continuance because he would still have been incarcerated on the date of the scheduled hearing and recognize that such incarceration was by his own doing. Nevertheless, *Father was set to be released only six weeks after the scheduled dispositional hearing.* Further, Father has demonstrated prejudice by the denial of his motion for continuance in that his ability to care for his children was assessed as of the date of the hearing he sought to have continued. At that time, Father was incarcerated and *had not had the opportunity to participate in services offered by the OFC or to demonstrate his fitness as a parent.* The result was that his parental rights were forever and unalterably terminated. This result is particularly harsh where Father, while incarcerated, participated in numerous services and programs, although offered by the correctional facility and not the OFC, which would be helpful to him in reaching his goal of reunification with his children.

*Rowlett*, 841 N.E.2d at 619 (emphasis added).

[22]     The case before us, however, is factually distinguishable from *Rowlett*. Whereas in *Rowlett*, the father was set to be released in six weeks, here Father still had 153 days—5 more months—of incarceration, followed two years of probation. *See* Tr. p. 64. But the most important difference is that in the case before us, Father *had* had the opportunity to demonstrate his fitness as a parent—indeed, he had had numerous opportunities over the course of many years, the majority of the children's lives. And yet, consistently and repeatedly, and despite the classes, counseling, and myriad opportunities to improve himself and become a

better parent, Father chose instead to continue his pattern of substance abuse and criminal activity.

[23] In light of all that Father has already done to hurt himself and his children, there would be no good reason for the trial court to give him further opportunities and more time to do so. At the time of the hearing, the children were already seven and eight-and-a-half years old, and Father still had five more months to serve, followed by two years of probation. Additionally, he did not have an apparent life plan—or, most importantly, a plan for meeting his parental responsibilities—once he is released; indeed, his primary plan is to "[s]tart counseling, individual counseling, therapy, substance abuse, whatever is available[,]" though he admits that "if the Court can't make an order for that [he] can't afford it." *Id*. at 150. Moreover, the children are not bonded to Father—he has been incarcerated most of their lives and they do not want to speak to him on the phone. Given these facts, we are unwilling to keep the children on a shelf until their parents are capable of caring for them properly. *See In re Campbell*, 543 N.E.2d 273, 275 (Ind. Ct. App. 1989). We find that the trial court did not abuse its discretion in denying Father's motion to continue because he has not shown that he was prejudiced by the denial. *See Rowlett*, 841 N.E.2d at 619.

# II. Termination of Parental Rights

[24] "The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children." *In re*

*K.T.K.*, 989 N.E.2d 1225, 1230 (Ind. 2013) (citations omitted). The parent-child relationship is one of our culture's most valued relationships. *Id.* (citation omitted). "And a parent's interest in the upbringing of their child is 'perhaps the oldest of the fundamental liberty interests recognized by the courts.'" *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). But parental rights are not absolute—"children have an interest in terminating parental rights that prevent adoption and inhibit establishing secure, stable, long-term, continuous relationships." *Id*. (citations omitted). Thus, a parent's interests must be subordinated to a child's interests when considering a termination petition. *Id*. (citation omitted). A parent's rights may be terminated if the parent is unable or unwilling to meet their parental responsibilities by failing to provide for the child's immediate and long-term needs. *Id*. (citations omitted).

[25] When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *Id.* at 1229 (citation omitted). Instead, we consider only the evidence and any reasonable inferences therefrom that support the judgment. *Id.* (citation omitted). "Where a trial court has entered findings of fact and conclusions of law, we will not set aside the trial court's findings or judgment unless clearly erroneous." *Id.* (citing Ind. Trial Rule 52(A)). In evaluating whether the court's decision to terminate the parent-child relationship is clearly erroneous, "we review the trial court's judgment to determine whether the evidence clearly and convincingly supports the findings and the findings clearly and convincingly support the judgment." *Id.* at 1229-30 (citation omitted).

Indiana Code section 31-35-2-4(b)(2)(B) provides that a petition to terminate parental rights for a child in need of services must allege:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). "DCS must prove the alleged circumstances by clear and convincing evidence." *K.T.K.*, 989 N.E.2d at 1231 (citation omitted). We note that Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive. Therefore, DCS was required to establish, by clear and convincing evidence, only one of the three requirements of subsection (B). Because we find it to be dispositive, we discuss only whether there was a reasonable probability that the conditions resulting in the children's removal or reasons for their placement outside of the parents' home would be remedied. *See* I.C. § 31-35-2-4(b)(2)(B)(i).

## A. Probability that conditions will not be remedied

On appeal, Father argues that the evidence does not support the trial court's findings and conclusions. Father's Br. p. 12. Father does not appear to

challenge any specific findings. Instead, he asserts that the "DCS evidence and the court[']s findings of fact showed that [] [F]ather's rights were being terminated due to his past criminal history," but argues that he was soon to be released from incarceration and had plans to make "life[-]altering changes – to change his priorities, to follow a different path, and to stay out of trouble upon his release from incarceration." Father's Br. p. 14. He points out that while incarcerated he sent letters to the children and participated in the phone calls that were arranged. Finally, he alleges that "[t]he CASA was never supportive of reunification with [] [F]ather." *Id*. at 15. Mother also does not challenge any specific findings of fact.

[29] In determining whether the conditions that resulted in a child's removal or placement outside the home will not be remedied, we engage in a two-step analysis. *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014) (citation omitted). We first identify the conditions that led to removal or placement outside the home and then determine whether there is a reasonable probability that those conditions will not be remedied. *Id*. (quotation omitted). The second step requires trial courts to judge a parent's fitness at the time of the termination proceeding, taking into consideration evidence of changed conditions, and balancing any recent improvements against "habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation." *Id*. (citations omitted). In so doing, trial courts have discretion to "weigh a parent's prior history more heavily than efforts made only shortly before termination,"

and courts may find "that parents' past behavior is the best predictor of their future behavior." *Id.*

[30] At the hearing, FCM Weinkauff testified that in her opinion, there is not a reasonable probability that the problems that led to removal will be remedied. This opinion, she testified, was based on "[t]he criminal history involving drug and substance use as well as alcohol use and previous CHINS cases . . . [c]ontinued re-entry into the system; continued incarceration over a long duration of time." Tr. p. 80. Regarding Father, FCM Weinkauff testified: "The particular thing I see is he's had chances to better himself, chances to get into treatment for drug and alcohol and all of his charges are generally involving that." *Id.* at 82. As to Mother, FCM Weinkauff stated that the problem was "[t]he same thing; repeated cycle of incarceration due to drug use, as well as repeated cycle involving CHINS cases." *Id.* at 85. CASA Goecker also testified as to the repetitive history of the parents being involved in crime and substance abuse.

[31] Following the hearing, the trial court set forth numerous findings of fact regarding the conditions that resulted in the children's removal or placement outside the home, the lack of a reasonable probability that those conditions would be remedied, and the parents' fitness at the time of the termination hearing. Among these findings are the following:

> 24. The parents have demonstrated a repetitive pattern of committing offenses and using illegal drugs both before and after the children's births. Father has been incarcerated for approximately seventy-five [percent] (75%) of the children's lives. Prior attempts at treatment and

repeated incarcerations have had no impact on the parents' historical failure to establish or maintain sobriety or stability for the children. Mother effectively abandoned the children throughout the majority of the third CHINS case. *Although Father made efforts to continue contact with the children and/or provide limited support during periods of incarceration, such efforts do not outweigh the significant instability caused by years of repeated absences.*

25. The parents also neglected the children's medical needs. At the time of removal, both children were taken to the emergency room. A[.R.] was treated for strep, an ear infection, and lice. T[.R.] was treated for strep and lice. A[.R.] required dental work including eight (8) crowns and four (4) fillings. T[.R.] required dental work consisting of two (2) crowns. T[.R.] also suffered from asthma and eczema in addition to needing treatment for a club foot.

26. As a result of ongoing substance use and criminal activity, the parents have exposed the children to unsafe people and unsafe environments. As a result of repeated incarcerations, the parents have failed to provide any stability or consistency for the children. Such exposure and lack of stability pose a risk to both the physical and emotional well-being of the children.

* * * * *

28. Although Mother and Father love the children, neither has the ability to meet the children's needs. *The long-standing history of instability displayed by these parents continues today. All imaginable services have been offered and nothing is singularly different in today's circumstances since the time of removal.* To continue the parent-child relationships would be detrimental to the children. The children need permanency now.

Father's App. p. 25 (emphasis added).

[32] On appeal, Mother and Father are merely asking this Court to reweigh the evidence as to whether the conditions that resulted in the children's removal are

likely to be remedied.[3]  However, as discussed above, this Court cannot reweigh the evidence.  *See K.T.K.*, 989 N.E.2d at 1229.  And despite Father's claims that he is set to turn everything around and become a model parent, the trial court already found that these claims didn't carry much weight in light of "the significant instability caused by years of repeated absences."  *See* Father's App. p. 25.  We find that there is clear and convincing evidence to show a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

## B.  Termination is in the best interests of the child

[33]     Father next contends that the trial court erred when it concluded that termination is in the best interests of the children.  Father begins by setting forth a not-terribly developed policy argument opposing "the breakup of the biological family."  Father's Br. p. 17 (citing *R.M. v. Tippecanoe Cnty. Dept. of Pub. Welfare*, 582 N.E.2d 417 (Ind. Ct. App. 1991)).  He then discusses how the children have had significant contact with his family, rehashes how even though incarcerated he maintained contact via letters and telephone calls with the children, and then provides his educational and work background.  He concludes by writing, "The children's best interests would be served by giving

---

[3] Incredibly, Mother argues as to the question of the conditions being remedied that "As far as the court knew at the time of the TPR trial, the father's potential as a parent was both unknown and untapped." Mother's Br. p. 9.

the father one short opportunity to prove, whether or not, he can be a good parent." Father's Br. p. 18. We disagree.

[34] At the hearing, CASA Goecker testified that her recommendation in this case is termination with adoption, primarily due to the parents' "drug uses and dependencies and unlawful doings." *Id*. at 119. There is certainly ample evidence to support this recommendation, including both Mother's and Father's extensive histories of instability, criminal activity, substance abuse, and neglect of the children. The evidence also shows that the children are not bonded to Father, which is not surprising since he has been absent for most of their lives. At the same time, the evidence shows that the children "look at foster mom and dad as their parents; they address them as mom and dad. They also are clearly attached to them . . . [and] to their foster siblings in the home . . . ." *Id*. at 90. Moreover, "the [children's] behaviors have improved, they have stability and structure . . . [t]hey have less outbursts; they listen to redirection; . . . and they get in less fights and arguments." *Id*. at 86-87. The trial court did not err in concluding that it is in the children's best interests that Mother's and Father's parental rights be terminated.[4] On appeal, Father is merely asking us to reweigh the evidence; this we will not do.

---

[4] Mother also sets forth a brief, confusing, and unpersuasive argument on the "best interests" requirement, which concludes as follows:

> Until the state proves unfitness, the best interest test is not even to be considered. A TPR case should not be a vehicle for social engineering. It should not be a vehicle to "fix" a child's life because there is a better option. Mother submits that the trial court erred in even reaching the issue of "best interest" herein.

# C. Satisfactory plan

[35] Finally, Father contends that DCS failed to prove it had a satisfactory plan for the children upon termination of parental rights because "a prospective non relative adoption in this case [] cannot be considered a satisfactory plan." Father's Br. p. 19. Father fails to provide any cogent argument or cite to any legal authority in support of this contention. We therefore consider this argument to be waived for purposes of appellate review. *See* Ind. Appellate Rule 46(A)(8)(a); *see also Shelby v. State*, 986 N.E.2d 345, 361 (Ind. Ct. App. 2013). Mother raises no argument on this issue.

[36] Waiver notwithstanding, we conclude that there is a satisfactory plan in place. For a plan to be "satisfactory," for purposes of the statute, it "need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated." *In re Termination of Parent-Child Relationship of D.D.*, 804 N.E.2d 258, 268 (Ind. Ct. App. 2004), *trans. denied*. Here, the trial court wrote in its order as follows:

> DCS has a satisfactory plan of adoption for the care and treatment of the children following termination of parental rights. The children can be adopted and there is reason to believe an appropriate permanent home has or can be found for the children as a sibling group.

Father's App. p. 26. This conclusion was supported by testimony of FCM Weinkauff and CASA Goecker and is not clearly erroneous.

---

Mother's Br. p. 10.

For the reasons set forth above, we find that termination of both parents' parental rights was supported by clear and convincing evidence and the trial court did not err in rendering judgment to this effect.

Affirmed.

Baker, J., and Riley, J., concur.